# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:12-cv-70-MR

|  |  |  |
|---|---|---|
| MONICA RAY TRAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM DECISION** |
| vs. | ) | **AND ORDER** |
| | ) | |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on both the Plaintiff's Motion for Summary Judgment [Doc. 9] and the Defendant's Motion for Summary Judgment [Doc. 10].

## I.    PROCEDURAL HISTORY

On April 10, 2008, Plaintiff, Monica Travis, filed a Title XVI application for Supplemental Security Income (SSI), alleging disability beginning on May 10, 2003. [T. 103-112]. Her initial application was denied on August 21, 2008. [T. 57-60]. Plaintiff filed a second application for SSI on February

_____

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.

3, 2009, alleging disability since May 7, 2000. [T. 113-121]. Her second application was denied on August 21, 2009, and again upon reconsideration August 28, 2009. [T. 61-67; 68-72]. Plaintiff filed a request for hearing on November 27, 2009, and a video hearing was held before Administrative Law Judge (ALJ) Marshall D. Riley on August 30, 2010. [T. 73-75; 78-102]. On September 14, 2010, ALJ Riley issued a decision denying Plaintiff's application. [T. 8-24]. Plaintiff appealed to the Appeals Council. The Appeals Council denied review thereby making the ALJ's ruling the final decision of the Commissioner. [T.1-7]. The Plaintiff has exhausted all available administrative remedies and this case is now ripe for judicial review pursuant to 42 U.S.C. § 405(g).

## II.  STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III. THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ goes no further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or

work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## IV.   THE ALJ'S DECISION

On September 14, 2010, the ALJ issued a decision denying the Plaintiff's claim. [T. 13-24]. Proceeding to the sequential evaluation, the ALJ found at step one that the Plaintiff had not engaged in substantial

gainful activity since January 22, 2009, her application date. [T. 13]. At step two, the ALJ then found that the medical evidence established the following severe impairments: chronic obstructive pulmonary disease (COPD) and heart disease. [Id.]. At step three, the ALJ determined that none of Plaintiff's impairments met or equaled a listing. [T. 16].

The ALJ then assessed the Plaintiff's RFC as required by step four. The ALJ concluded that the Plaintiff had the ability to perform light work as defined in 20 C.F.R. § 416.967(b). In support of this conclusion, the ALJ found that the Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, and that she could stand, sit, or walk about six hours in an eight-hour workday. The ALJ further found that the Plaintiff could never use ladders, ropes, scaffolds; occasionally balance and climb ramps and stairs; frequently stoop, kneel, crouch, and crawl; and that she had no manipulative, visual, or communicative limitations. Finally, the ALJ found that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, heights, hazards, and machinery. [T. 23-24].

At the fifth step of the sequential evaluation, the ALJ determined that the Plaintiff was not capable of performing her past relevant work as a twisting machine operator, waitress, or grill cook. [T. 23]. Considering the Plaintiff's age, education, work experience, and residual functional

capacity, the ALJ further found that there were other jobs that existed in significant numbers in the national economy that the Plaintiff could perform such as food prep worker, cafeteria line server, non-farm animal care, cashier, assembler, and machine tender. [T. 23-24]. He therefore concluded that the Plaintiff was not "under a disability, as defined by the Social Security Act, since January 22, 2009, the date the application was filed (20 CFR 416.920(g))." [T. 24].

## V. Plaintiff's Relevant Medical History[2]

On May 14, 2000, Plaintiff arrived at the Emergency Room of Mission Hospital with multiple complaints. According to the intake summary:

> The patient states she began approximately six to eight months ago with a nonproductive cough. She has had symptoms off and on. No actual cold symtpoms [sic]. The patient has had a headache off an [sic] on for four months. The worse [sic] episode was January and lasted about three days, and since then has had headaches off and on but less severe. The patient has also had intermittent nausea for about one week without any vomiting. No diarrhea. The patient pulled a tick off about three weeks ago. She began with fever today of 101.1. No rash has been noted.
>
> The patient has had about two months of left foot pain that was pretty severe initially and then improved. It has worsened again and was seen by a podiatrist about 10 days ago and was told she had a bone spur. She was started on Celebrex. An x-ray was not done at that time.

---

[2] In addition to this summary of the facts, the Court has incorporated other relevant facts into its Discussion, infra, at Part VI.

> The patient yesterday had onset of left lateral hip pain on the greater trochanter. Her friend states that it occurred [sic] to be somewhat swollen yesterday. It was less swollen today. She also hand [sic] swelling from the ankle to the knee yesterday, and that has resolved and now is just on the plantar surface of the foot. The patient has a job where she works 80 or 90 hours a week, is on her feet 10 to 12 hours on a daily basis. She thinks that may be related to her pain.
>
> The patient is a smoker.

[T. 388]. The ER staff ordered x-rays of Plaintiff's chest, left hip, pelvis, and left foot, as well as a blood culture for aerobic and anaerobic organisms in an effort to determine the cause of Plaintiff's fever. [T. 395]. All of Plaintiff's x-rays were normal. Her chest x-ray showed both lungs to be expanded and clear, and her heart and bony structures were within normal limits [T. 404]. Her hip and pelvis x-rays showed no fracture or dislocation, and her hip joints were symmetrical [T. 403]. Her foot x-ray showed no acute bony injury, fracture or dislocation, and no foreign bodies were identified. [Id.]. Plaintiff was released, the ER staff having the impression that she had some type of febrile illness, potentially including Rocky Mountain Spotted fever unless ruled out by lab results, possible arthritis of the hip and foot, and chronic cough. [T. 390].

Plaintiff was admitted to Margaret Pardee Hospital, on May 6, 2003, complaining of shortness of breath, cough, and fever. She was diagnosed

with bilateral pneumonia and likely gastritis. [T. 237]. During her hospital stay, she was placed on oxygen and prescribed antibiotics to address the pneumonia. Further, she was advised to stop smoking tobacco. Significantly, the hospital staff detected that Plaintiff had a heart murmur and opined that it might be consistent with mitral regurgitation and ordered further testing. [T. 238].

In the following five years, Plaintiff presented to various health care providers complaining of shortness of breath, chest pain, dizziness, cough, and lethargy. On February 24, 2004, Dr. Levene examined Plaintiff and documented that she looked well on examination, her heart rate was regular, her respirations were unlabored, her lungs were clear throughout without wheezes, rales, or rhonchi, and she had no edema in her extremities. He suggested a repeat echocardiogram to re-evaluate her mitral valve disease. [T. 682]. A little more than one year later, Plaintiff appeared at Mission Hospital's Emergency Room complaining of chest pain. [T. 434]. There, Dr. Horine observed, on March 18, 2005, that Plaintiff was in no distress, she was alert and oriented to three spheres, she had only slightly diminished breath sounds, her heart was regular, she had no edema in her extremities, her neurological findings were intact, and her EKG revealed a normal sinus rhythm. [T. 435, 443]. Dr. Horine noted

8

Plaintiff's "Tobacco habituation" as well as "[a] loud systolic murmur is appreciated[,]" and suggested a follow up consult with the cardiology department. While Plaintiff "was waiting for cardiology[, she] subsequently told the nurses that she wanted to leave against medical advice. She was warned." [T. 436]. Plaintiff was "discharged and asked to follow up with Asheville Cardiology and return at any time if she wishes further workup or treatment here." [Id.].

On July 7, 2007, Plaintiff sought treatment at the Spruce Pine Community Hospital arriving with a 101 degree fever and complaining about chest pain and shortness of breath. [T. 269]. The attending physician noted that Plaintiff continued to smoke tobacco, was in no acute distress, was oriented to three spheres, had normal respiratory effort, and was not experiencing any abnormalities in her mood or affect. [Tr. 272]. She was placed on doxycycline for pneumonia and discharged in stable condition. [Id.].

On February 11, 2008, Plaintiff appeared at the Blue Ridge Regional Hospital and was admitted. [T. 274]. In Plaintiff's past history, Dr. Carroll, Plaintiff's primary care doctor and her treating physician that day, noted:

> She was hospitalized in 2003 with pneumonia at Pardee Hospital. She was found to have a hole in her heart and atrial fibrillation. Surgery was recommended, but she was told to quit

smoking first but never did.  She states that they told her to take iron and potassium for her atrial fibrillation. … As a child a car ran over her leg and she was told she wouldn't walk again.  She is able to walk, but activity is limited by shortness of breath. … She smokes about a pack of cigarettes a day. … Alert white female looking much greater than stated age, in no distress. She is somewhat pale, strong odor of tobacco. She was offered, but declined, a nicotine patch.

[T. 276].    Plaintiff was discharged February 15, 2008, with the following

diagnoses:

1.    Bilateral basilar pneumonitis
2.    Recurrent onset of A. fib with rapid rate, now controlled
3.    Presumed rheumatic heart disease with severe mitral regurgitation, moderate to severe mitral stenosis, and severe tricuspid regurgitation.
4.    Pulmonary hypertension due to premature COPD, rule out alpha 1 antitrypsin deficiency.
5.    Tobacco abuse
6.    Transient mild hyperglycemia

[T. 274]. Upon Plaintiff's discharge, Dr. Carroll observed that she was in no

acute distress, she was oriented to three spheres, she had no rales or

wheezes, and her speech and lower limbs were normal. [T. 303].

During Plaintiff's admission at Blue Ridge Regional Hospital, Dr.

Carroll called Asheville Cardiology Associates on February 12, 2008, and

spoke with Dr. James Usedom. Dr. Carroll wanted to refer Plaintiff to Dr.

Usedom's practice to evaluate her heart condition further.  Dr. Usedom

documented his file in part with the following information based on that phone call:

> Dr. James Carroll called about Monica Travis. She is a 35-year-old woman who reportedly has a history of chronic obstructive pulmonary disease, mitral regurgitation. Four years ago she was hospitalized in Hendersonville with atrial fibrillation and pneumonia. She spontaneously converted to sinus rhythm. She is new [sic] hospitalized with mitral regurgitation and pneumonia. Four years ago she had severe mitral regurgitation, severe tricuspid regurgitation with an estimated pulmonary artery systolic pressure of 450 mmHg. Apparently mitral valve intervention was advised although according to Dr. Carroll, she was told she would need to quit smoking. According to Dr. Carroll, she has "terrible lungs" and continues to smoke.

[T. 670]. Soon thereafter, Plaintiff was seen at Asheville Cardiology. Todd Stringer, physician's assistant at Asheville Cardiology, examined Plaintiff on April 9, 2008, where she presented with a history of severe mitral regurgitation, thought to be related to rheumatic heart disease, and a history of long-standing tobacco abuse. [T. 464]. Mr. Stringer noted that Plaintiff's condition was maintained on Symbicort, symptom-wise she was stable from a cardiac standpoint, and there was no evidence of chest pain, ankle edema, or worsening dyspnea. Further, Plaintiff stated she quit smoking but declined any tobacco cessation information. [T. 645]. Upon examination, the provider found that Plaintiff was in no acute distress, she was alert and oriented, her lung effort, gait, strength, and coordination were

normal, she had no peripheral edema or spasms, her affect was appropriate, her motor, sensory, and reflex findings were grossly normal, her pulmonary function tests revealed a mild restriction but no significant obstructive disease, and her "atrial fibrillation [had] controlled rates." [T. 465-466]. Ultimately, Mr. Stringer recommended Plaintiff follow up for potential cardiothoracic surgery to address her underlying severe mitral valve regurgitation. [T. 466].

Plaintiff returned to Asheville Cardiology on May 9, 2008, for pre-operative testing. Mr. Stringer noted:

> From a symptomatic standpoint, she is doing well. There has been no new resting dyspnea, chest pain, orthopnea, or paroxysmal nocturnal dyspnea. She has dyspnea with exertion which is chronic and overall the same. She is still smoking, unfortunately. She has had no tachypalpitations. … Tobacco use: The patient currently smokes cigars.

[T. 638].

On May 14, 2008, Plaintiff underwent open heart surgery at Mission Hospitals. Dr. Alan Johnson performed a mitral valve replacement with a 31mm St. Jude valve. Further, Dr. Johnson performed a tricuspid valve repair with a 34mm ring, and the excision of the left atrial appendage. [T. 479]. Plaintiff was discharged May 17, 2008, in stable condition. At the time of discharge, Plaintiff's heart was in a sinus rhythm of 80 to 90 and

she was able to walk down the hallway.  [Id.].  Following her heart surgery, Plaintiff continued seeing her primary care physician, Dr. Carroll, for her routine care and Asheville Cardiology for her post-operative cardiac care.

## VI.    DISCUSSION

The Plaintiff asserts the following assignments of error: (1) the ALJ failed to comply with 20 CFR 404.1527 by rejecting the medical opinion of the Plaintiff's treating physician, Dr. James Carroll; (2) the ALJ relied upon a state agency physician's assessment of Plaintiff's limitations as opposed to Plaintiff's treating doctor's assessment; (3) the vocational expert's testimony, regarding the type of work Plaintiff can perform, is inaudible on the hearing tape; and (4) the ALJ committed revisable error in relying on Plaintiff's failure to take prescription medication as a basis for questioning her credibility.   [Doc. 9-1].   The Plaintiff's first two arguments can be addressed simultaneously.

### A.    Plaintiff's First Two Assignments of Error.

Plaintiff asserts that the ALJ erred in failing to give Dr. Carroll's opinion controlling weight [Doc. 9-1 at 11-15], and that the ALJ relied upon the state agency physician's assessment of Plaintiff's limitations as opposed to Dr. Carroll's assessment. [T. 16].   Plaintiff's arguments, however, are without merit. In order for a physician's opinion to be given

controlling weight the following factors must be present: 1) the opinion must be from a treating source; 2) the opinion must be a medical opinion concerning the nature and severity of the claimant's impairment; and 3) the opinion must be well-supported by medically acceptable "clinical and laboratory diagnostic techniques." Social Security Ruling ("SSR") 96-2p. While Dr. Carroll was Plaintiff's treating source and gave an opinion concerning the nature and severity of Plaintiff's impairments, his opinion was inconsistent with his own progress notes contained in Plaintiff's medical file. It was, therefore, not supported by medically acceptable clinical and laboratory diagnostic techniques. Additionally, when considering Plaintiff's record as a whole, Dr. Carroll's opinion concerning the nature and severity of Plaintiff's impairments was insufficient to be given controlling weight under SSR 96-2p.

### 1. Dr. Carroll's Physical Impairment Opinion

Dr. Carroll opined that the medical conditions affecting Plaintiff's ability to work were: "Heart failure, mitral valve replacement, decreased lung function (COPD), Bipolar D/O."[3]  [T. 734].  His own treatment notes,

---

[3] The Court will address Dr. Carroll's three alleged physical disabilities plaguing Plaintiff in this subpart and then will address Dr. Carroll's assessment of Plaintiff's Bipolar disorder in subpart 3, infra.

however, fail to substantiate these opinions. [T. 542-554, 570-573, 712-716, 748-760].

On May 30, 2008, Plaintiff met with Dr. Carroll to begin her post-operative follow up care. His notes that day reflect the following:

> She had mitral valve replacement with a St. Jude mechanical prosthesis, tricuspid valve repair with annuloplasty ring, and excision of left atrial appendage at Mission on 5/14. She had an uncomplicated recovery and is feeling a little better. Her chest hurts if she uses her arms. She has had one wheezing spell since then, treated with a Nebulizer. She is off the diltiazem but otherwise on the same medicines. She is taking 0-2 Percocet a day and about one Ultram a day for pain. She revealed that, although she quit smoking cigarettes, she smoked "about 100" cigars last month, though none since her surgery.

[T. 545]. Plaintiff reported that she was feeling a little better after her mitral valve replacement, and the doctor observed that she was in no distress, her lungs were clear with only slightly decreased breath sounds, she had no edema in her extremities, and her atrial fibrillation rate was well-controlled on medication. [T. 545-546]. Absent from Dr. Carroll's notes on this date is any reference to Plaintiff's past mental health complaints. Significant, however, was his cautionary statement to Plaintiff: "Again instructed her to stay completely off of cigarettes and she realizes the importance of doing that." [T. 545].

Dr. Carroll found on July 9, 2008, that Plaintiff was in no acute distress, and on July 31, 2008, that she had a few scattered wheezes, but was also smoking three to four cigarettes a day. [T. 547]. "Strongly advised her to pick a quit date and stop completely." [Id.].

On October 2, 2008, Plaintiff informed the doctor that, while she developed chest pain four days prior, she spent the two days before the onset of her symptoms mowing waist high grass with a push mower. [T. 548]. Dr. Carroll went on to observe that Plaintiff was experiencing a few, faint wheezes, she had minimal left parasternal chest wall tenderness, her heart was regular and in sinus rhythm since her valve repair, and she had no edema in her extremities. He noted Plaintiff was "still taking an occasional Lorazepam for anxiety" and reiterated that he "strongly encouraged her to quit" smoking. [Id.].

Plaintiff missed her appointment with Dr. Carroll on December 4, 2008, and rescheduled for February 2, 2009. [T. 549]. Doctor Carroll examined Plaintiff on that date and determined that her chronic heart failure was stable, her lungs were clear, her heart was regular, Depakote was controlling the severity of her migraines, and importantly, she rarely took medication for anxiety. [Id.]. Regarding Plaintiff's "[t]obacco abuse," he

noted, "still smoking a half pack a day. Plans to quit but hasn't picked a quit date.  I encouraged her to do so."   [Id.].

Dr. Carroll noted on May 18, 2009, that Plaintiff had been doing well over the last few weeks, and the intensity of her migraines "had diminished greatly" since October, but she started smoking again in October,[4] and was up to one pack a day. [T. 570-571].  The doctor added that Plaintiff was in no distress, her heart was regular, she was not experiencing any rales, rhonchi, or CVA tenderness, she had mildly decreased flexion, her shoulder range of motion was normal, her Romberg sign was negative, she seemed to be in sinus rhythm, and she was doing well with her history of chronic heart failure, as she only required an occasional dose of Lasix. [T. 571-572].

On January 19, 2010, Dr. Carroll noted that Plaintiff had failed to return as needed for her INR. [T. 712]. The doctor went on to find that Plaintiff was only mildly depressed but well directed, and her heart rhythm and extremities were normal. [T. 712]. Dr. Carroll further found on February 23, 2010, that Plaintiff was not experiencing any palpitations, chest pain, shortness of breath, leg swelling, cough, or wheezing, and her mobility,

---

[4] In reality, as disclosed in Dr. Carroll's progress notes, discussed supra, Plaintiff never stopped smoking at all.

mood, affect, respiratory movement, and heart rate were normal. [T. 755-756]. Her major complaint that day was irritability aggravated by "hot flashes." [T. 755]. Regarding her tobacco use, Dr. Carroll observed she was "down to ½ ppd." [Id.]. Plaintiff's office visit on March 30, 2010, was unremarkable. [T. 751-752]. On April 16, 2010, Dr. Carroll noted that Plaintiff only had mild shortness of breath, leg swelling, and chronic cough, and she had experienced less chest pain since her last Holter monitor. [T. 750]. Plaintiff did express feelings of depression to Dr. Carroll on this visit. [Id.]. She related that she "enjoys being with her many cats, more so than with people." [Id.]. Dr. Carroll set up an appointment for Plaintiff with Tim Evans, a Licensed Clinical Social Worker and colleague in his office. Plaintiff met Mr. Evans for a counseling session April 29, 2010. [T. 760]. At that meeting with Mr. Evans, Plaintiff related the following about her receptiveness to therapy:

> Monica reports that she does not really want to have counseling, has not had positive experiences in the past, doesn't see how it will help her. [H]er family, doctors, and lawyer all say that she should be in counseling so she is here. She does see that it would be better for her to do something besides hang out with her cats all the time, but she likes to do that. She also wants to quit smoking. We discuss [sic] setting quit date, possibility of Chantix. She is interested in electronic cigarette replacement device that a friend of hers used with success. Son says he will do it with her. Discussed setting date, but she will not do this until she figures out where she will get

18

> the money for the replacement. Monica's M[other] had a car accident, is doing okay, but Monica is staying with her In Asheville while she recovers.

[T. 760].

As demonstrated by Dr. Carroll's progress notes, Plaintiff's cardiac condition following her surgery showed progressive improvement up to the filing date of her application in this matter. Further, while Plaintiff's condition of COPD did not consistently improve in the same manner, Plaintiff's failure to cease smoking illustrates the adverse impact her tobacco use played on her symptoms of dyspnea and wheezing. Plaintiff's breathing difficulty was exacerbated by, and tracked closely with, her increased tobacco consumption. Conversely, Plaintiff's lung functioning improved dramatically with the reduction in the number of cigarettes Plaintiff smoked per day. All of these medical findings fail to substantiate Dr. Carroll's opinions; in fact, they refute his opinions. The ALJ was thus justified in rejecting Dr. Carroll's disability opinion based on the inconsistency of that opinion with his own treatment notes. [T. 542-554, 570-573, 712-716, 748-760]. Additionally, the record evidence gathered from Plaintiff's other source providers corroborated Dr. Carroll's treatment notes which in turn undermined his opinion of Plaintiff's disability.

## 2.    Plaintiff's Other Source Providers

During this same two-year period following Plaintiff's heart surgery, Asheville Cardiology verified much of Dr. Carroll's observations regarding Plaintiff's overall health improvement. Ashville Cardiology also documented Plaintiff's sporadic compliance with post-operative care directives and her utter rejection of tobacco abstinence.

Plaintiff missed her September, 2008, appointment with Asheville Cardiology and rescheduled for October 15, 2008.  [T. 618].  On that date, Plaintiff was seen by Dr. Michael Unks. After a passing reference to Plaintiff's laudable post-operative improvement, Dr. Unks' notes are devoted to Plaintiff's tobacco addiction:

> The patient has done well since her surgery. She states that her breathing has significantly improved.  She denies any excessive exertional dyspnea, wheezing, lower extremity edema, subjective palpitations, or chest discomfort. Unfortunately, she has resumed cigarette smoking, but is interested in quitting.
>
> * * * * * * * * *
>
> Tobacco use: The patient currently smokes 1/2 pkpd [sic] packs per day. Patient in for office evaluation.  Verbalizes use of tobacco products. Detrimental side effects tobacco and benefits of cessation discussed with patient.  Cessation options reviewed and educational pamphlets as well as contact numbers provided.  Patient verbalizes understanding of detrimental effects of tobacco use and reason for counseling.

[Id.]. Because of Plaintiff's overall health improvement, Dr. Unks scheduled Plaintiff's next follow up visit one year later. [T. 620]

Plaintiff missed her following two appointments with Dr. Unks at Asheville Cardiology in the fall of 2009. She was next seen again at that practice on November 24, 2009. At that appointment, Plaintiff was assessed with first degree atrioventricular block requiring a medicinal change. She described normal daily activity, no discomfort walking and no edema although she expressed some dizziness and episodes of double vision. Plaintiff had gained weight with a corresponding increase in abdominal girth. Finally, Plaintiff admitted to smoking one pack of cigarettes per day and declined any tobacco cessation information. [T. 612].

The other source record evidence thus portrays Plaintiff, during the late summer 2009 into the spring of 2010, as a person indifferent to the maintenance of a lifestyle conducive to a pro-active health regimen. The state agency physician, Dr. Bertron Haywood, conducted a review of Plaintiff's medical record and summarized his findings cogently:

> Allegations are partially credible. Clmt. has MDI's of mitral valve replacement, respiratory d/o, and migraines. Cardiac function much improved since valve replacement. Breathing much improved per clmt. at OV's. On/off migraines, appear improved

> w/ medications. Capable of Light RFC w/ postural and enviromental limitations

[T. 585]. Dr. Haywood's conclusions thus support Dr. Carroll's progress notes as well as the record evidence compiled by Plaintiff's other source providers. An ALJ can follow the opinion of a non-examining physician if that opinion is consistent with the record. Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). In this matter, Dr. Haywood's opinion is consistent with the record.

### 3. Dr. Carroll's Mental Impairment Opinion

The Plaintiff next argues that the ALJ failed properly to assess her mental health condition by rejecting Dr. Carroll's Bipolar disorder opinion. [Doc. 9-1 at 11]. Dr. Carroll, however, never diagnosed Plaintiff with Bipolar disorder nor did his medical file concerning Plaintiff disclose any documentation or opinion from any mental health practitioner that would support such a diagnosis. According to Dr. Carroll, Plaintiff *reported* that she previously had been diagnosed with Bipolar disorder. [T. 712]. Thereafter, Dr. Carroll simply noted that Plaintiff "[a]dmits to several representative symptoms." [Id.]. The ALJ was free to reject Dr. Carroll's Bipolar disorder opinion of Plaintiff for these reasons. The ALJ, however, did evaluate Plaintiff's medically determinable mental impairment of an

affect disorder and found that it was not severe. [T. 14-16]. The Plaintiff has not challenged this finding and the Court, therefore, will not review it.

### 4. Conclusion

When comparing Dr. Carroll's opinion – that Plaintiff suffered four disabling impairments – with Plaintiff's medical record as a whole, the Court concludes substantial evidence exists to support the ALJ's determination rejecting Dr. Carroll's opinion as not well-supported by medically acceptable clinical and laboratory diagnostic techniques. Rogers v. Barnhart, 204 F.Supp.2d 885, 893 (W.D.N.C. 2002) ("Even the opinion of a treating physician may be disregarded where it is inconsistent with clearly established, contemporaneous medical records"). The Court also concludes substantial evidence exists to support the ALJ's determination accepting the opinion of the state agency physician, Dr. Bertron Haywood. Finally, the Court concludes substantial evidence exists to support the ALJ's determination rejecting Plaintiff's contention that Dr. Carroll had provided an opinion of Bipolar disorder.

In sum, the Court finds that the ALJ's decision contains a thorough discussion of the evidence of record, including the medical opinions, objective medical evidence, and treatment notes. The Plaintiff's first two assignments of error, therefore, are without merit.

## B.  Plaintiff's Third Assignment of Error.

Plaintiff asserts, as her third assignment of error, that the Vocational Expert's testimony regarding the type of work Plaintiff can perform is inaudible on the hearing tape.  [Doc. 9-1 at 16-17].  Plaintiff contends that, without being able to verify what the VE said, no rationale exists to support the ALJ's determination of the type of work suitable for the Plaintiff.  [Doc. 9-1 at 17].

During the hearing, the ALJ posed four hypothetical questions [T. 51-53] to the Vocational Expert, Dr. Robert S. Spangler. [T. 98-102].  The answers to these hypotheticals all are easily understood from the written transcript. The ALJ first asked what jobs would be available to a person such as Plaintiff but with the exertional limitations as set forth in record document Exhibit 20F, Dr. Haywood's medical RFC assessment of Plaintiff. VE Spangler responded that there exist approximately 87,937 [40% of 219,843] jobs within a 150 mile radius of Asheville requiring light, limited exertion such as food prep, food prep serving, cafeteria line, non-farm animal care, cashier, assembler, and hand-picker.  [T. 51].  Next, the ALJ asked a follow up hypothetical of what jobs would be available to a person such as Plaintiff but with the limitations as set forth in record document Exhibit 32F, Dr. Carroll's assessment of Plaintiff.  VE Spangler responded

that there would be no jobs available under that scenario: "It would knock out the remaining 40 percent." [Id.].

The third hypothetical posed by the ALJ to VE Spangler asked what jobs would be available to a person such as Plaintiff but with the non-exertional limitations as set forth in record document Exhibit 22F, Dr. Eleanor Cruise's Mental Residual Functional Capacity Assessment of Plaintiff. VE Spangler explained that he could not give the ALJ a job estimate in response to this hypothetical because Dr. Cruise's assessment contained too many variables. [T. 51-52]. Finally, as his last hypothetical, the ALJ asked the VE about the category of any local jobs available for a person such as Plaintiff, given her background, age, education, and relevant work experience, and assuming as true, the facts and circumstances Plaintiff described in her testimony before the ALJ. VE Spangler responded that such jobs would fall into the category of "[s]edentary on a part-time basis[.]" [T. 53].

While some minor portions of the recorded testimony taken by the ALJ during Plaintiff's hearing are inaudible, the official written transcript made from that recorded testimony is more than sufficient for the Court to understand what evidence was presented by VE Spangler in response to the ALJ's questions. Plaintiff's claim that the record contains insufficient

testimony to support the ALJ's ruling is exaggerated. The Court concludes substantial evidence exists in the form of VE Spangler's testimony to support the ALJ's determination of the type of work suitable for the Plaintiff. Accordingly, Plaintiff's third assignment of error is without merit.

### C. Plaintiff's Fourth Assignment of Error.

As her last assignment of error, Plaintiff maintains that the ALJ committed reversible error in relying on Plaintiff's failure to take prescription medication as a basis for questioning her credibility. [Doc. 9-1 at 17]. In support of her argument, Plaintiff cites to SSR 96-7p for the proposition that an ALJ may not draw any negative inferences about an individual's symptoms or her functional capacity from a failure to seek or pursue regular medical treatment, without first considering any evidence which may explain infrequent or irregular medical visits or her failure to seek medical treatment. [Id.]. Plaintiff's assignment of error is flawed for two reasons.

First, the ALJ did not use Plaintiff's failure to take prescription medication as a basis for questioning her credibility at all. On the contrary, the ALJ accorded full truth to the Plaintiff's statements. To be sure, the ALJ's discussion of this issue came in the course of the proceedings where he was required to assess the *severity* of Plaintiff's affective disorder, not

*whether* she suffered from a mental impairment. The ALJ's ruling, in relevant part, states:

> In conclusion, the record reflects that the claimant was prescribed medication and did not take the medication often. The claimant has also not sought a great deal of treatment regarding mental allegations. The claimant primarily complained about, and sought treatment, regarding physical problems, rather than mental allegations. The undersigned finds that that claimant's allegations of an affective disorder is not of the frequency, severity, or duration to cause significant functional limitations. Therefore, this is not a severe impairment.

[T. 16]. When Plaintiff's assignment of error is placed in the proper context, and when the Court considers the record evidence as a whole, it becomes clear that the ALJ found truthful Plaintiff's statements regarding her mental health treatment and her infrequent use of prescribed medication. The ALJ, in fact, relied upon the accuracy of Plaintiff's statements in arriving at his conclusion concerning the severity of her affective disorder. Plaintiff's credibility in this regard, therefore, was not in question.

Second, other record evidence from the Plaintiff herself illustrates that she was not truthful with her own primary care physician, Dr. Carroll, thereby opening the door to the ALJ's consideration of her credibility on other issues. The record is replete with evidence concerning Plaintiff's tobacco use. The Court, here, does not propose that Plaintiff's many

admissions to her providers, including Dr. Carroll, about her future desire to quit smoking, or her future desire to formulate a plan to do so, were either insincere or untruthful. Addiction in any form is an intractable condition and the Court is sympathetic to those, like Plaintiff, caught in its grasp. Plaintiff however, prior to her open heart surgery in May of 2008, made a knowingly false assertion to Dr. Carroll. She told him she had quit smoking cigarettes. That may have been correct as far as it went, but Plaintiff failed to tell Dr. Carroll the complete truth. Even though Plaintiff had stopped smoking cigarettes, she had instead smoked "about 100" cigars in the preceding month. [T. 545]. Plaintiff knew she had to quit smoking before her heart operation; her heart operation had not been scheduled in any of the previous five years due entirely to Plaintiff's incessant tobacco abuse. Until Plaintiff's mea culpa, Dr. Carroll labored under the incorrect assumption that Plaintiff had stopped smoking in the weeks leading up to her open heart surgery. By her own admission then, Plaintiff engaged in behavior specifically calculated to deceive her doctor until her surgery was complete.

To the extent that the ALJ was required to resolve any issues that involved Plaintiff's veracity, the Court concludes substantial evidence exists in the record to show that her claims were not always credible.

## VII.  CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability from the alleged date of onset.

**O R D E R**

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 9] is **DENIED**; the Defendant's Motion for Summary Judgment [Doc. 10] is **GRANTED**; and the Commissioner's decision is hereby **AFFIRMED**.  This case is hereby **DISMISSED WITH PREJUDICE.**  A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: April 7, 2014

Martin Reidinger
United States District Judge